Thank you, Your Honors. Peter Russin and my colleague Eric Ostroff of Millan, Russin & Budwick on behalf of Mariposa Associates, Ltd., the appellant in this case. Your Honors, both Regions Bank and my client agree that there is a Scribner's error in either the Mariposa Amendment to Loan Agreement or the Miami-Dade Amendment to Loan Agreement since those two documents send the sale proceeds from the sale of the 8-acre out parcel to be applied to two different loans. In that agreement that there is a Scribner's error, that creates the ambiguity that we believe the District Court erred in not addressing. The District Court never got to that issue because the District Court entered summary judgment despite this ambiguity and despite the issues of material fact that go along with it. The Court stated that the Court believed it should stop at the and-or connector issue by stating as follows, I cannot, however, consider this separate argument relating to a separate loan in interpreting the unambiguous and determinative term and-or contained in the 2000 Amendment to Loan Agreement. The problem with that, Your Honors, is that the record here clearly indicates that there was enough money from the sale of the 8-acre out parcel to pay all of the required elements of Paragraph 3E of the Mariposa Amendment to Loan Agreement. The District Court erred not only in its determination of what and-or means but also by virtue of not taking the next step in determining whether there was or accepting that there was enough money and therefore applying that fact to what and-or means as well as erring in not giving appropriate meaning or distinction to the ambiguity contained within the two Amendments to Loan Agreements which needed to be read together as we argued below. Your Honor, let me get into those two issues in greater detail. Most importantly, in our view, the Order ignores genuine issues of material fact which can only be resolved at trial because of the ambiguity I have addressed between the Mariposa Amendment to Loan Agreement and the Miami-Dade Amendment to Loan Agreement. As I said, the Region's attorneys as well as Mariposa's attorneys, I'm sorry, the Region's attorneys who drafted the documents simply made a mistake, made a mistake. These two amendments are almost identical except for one big problem. The Mariposa Amendment to Loan Agreement states the Miami-Dade out parcels proceeds go to pay the Mariposa loan while the Miami-Dade Amendment to Loan Agreement states the very same proceeds go to pay the Miami-Dade loan, a different loan. Both cannot be correct. We all know that the exact same money can't go to two different places. That is by definition an ambiguity. Even Regions agrees that the Scrivner's error in one of the documents needs to be addressed. The only difference is that Regions argues that the Scrivner's error is in the Mariposa Amendment to Loan Agreement and of course we argue that the Scrivner's error is in the Miami-Dade Amendment to Loan Agreement. This textbook issue of material fact, the Court refused to address because the Court determined that the and or connector was dispositive of this case. But it gave them options as to which loan to apply it to. Not options as to which. That resolved the ambiguity. It could either do it and go back above to the first loan or it could do or to the Miami-Dade loan. That's kind of how the District Court construed it. Not quite, Your Honor. Close, but not quite. Let me explain. In the Mariposa Amendment to Loan Agreement, paragraph 3E, it states that the borrower shall use the proceeds from the sale of the 8-acre out parcel, and here it was Mariposa, shall use the proceeds from the 8-acre out parcel owned by the Miami-Dade borrower to pay the Mariposa loan, to pay interest reserves on both the Mariposa loan and the Miami-Dade loan. I got that. And then it says and or the Miami-Dade loan. No, and then it says and or real estate taxes on both loans. It does not say and or one of the two loans. That's the difference. And, Your Honor, if I may, we can turn to that specific paragraph and we can read it. And let me just read it because we'll be very clear on this point. Paragraph 3E states, in the event of a sale of a portion of the premises. I see and or to pay the 2008 Everarm taxes in connection with the premises and the property that is security for the Emerald Point loan, which is the Miami-Dade loan. Miami-Dade loan. Right. So it's only on taxes. So the only place it addresses the loan that's going to be paid is in Romanet 1, where it says to reduce the outstanding principal of the loan, capital loan. Yeah, but it then says in B, it says to replenish the reserve account in the loan, to reduce the balance of the loan, and the definition of the loan is the Miami-Dade loan. Yeah, but that is, Your Honor, that is only. That's another ground that he relied upon or she relied upon. Your Honor, that is. The definition of the loan is the Miami-Dade loan. Your Honor, at most, that's an ambiguity that needs to be addressed because in our reading of the loan that's defined in that document, it's very clear that it's referring to the Mariposa loan. Later in that same paragraph, to the extent it refers to capital L loan as the Miami-Dade loan, that's an ambiguity. And it is clear that if you read the Mariposa Amendment to Loan Agreement and the Miami-Dade Amendment to Loan Agreement side by side, the paragraphs are basically exactly the same. I want to switch to another issue, which is the promissory note and the release of collateral provision in it. Are you with me? Certainly, yes. All right. So Regence sells the St. Lucia loan to the Florida Partners, right? Yes. And when Regence does that, it releases its interest in the mortgage on the property, right? The second mortgage on the Miami-Dade property, yes. Right, the second mortgage. Okay. So, and the out parcel comes from the Miami-Dade property, right? Correct, Your Honor. Okay. So, in effect, I know we've got these amendments over there we've got to read with all of this. Right. But if we didn't have these amendments, you don't contest the fact because it was like a 6-3, it was a larger loan and they sold it for 2.8 to the Florida people and released part of the collateral, which happens all the time. Well, yes, but not quite. Let me just get the ... I'm not saying where we go from that. I'm just saying Regence released the collateral, right? Released the Miami-Dade collateral for the St. Lucia loan and left only the St. Lucia loan collateral for the St. Lucia loan, correct? That's correct. All right. And so Regence gets this 1.3 for it, for this $2.8 million loan. Correct. There's a deep discount, but that happens all the time. They'll sell off part of the loan, they'll release some of the collateral. So, for the St. Lucia loan, for all practical purposes, forget about these two amendments. It's been released and in the promissory note that Mariposa signed, they agreed to a release of collateral without notice, no matter what Linda wants to do. We agree, right? I'm not disputing that. I do have arguments, but I'm not disputing what you've said so far, Your Honor. Okay. So, why does that ... That's the promissory note, okay? Yes. And that's the governing document on which you get the deficiency judgment, is the promissory note. All right. These terms of release of collateral are in the promissory note. You with me? Yes, but I don't agree necessarily with ... Okay. When they sue your clients and they, on the St. Lucia loan, they get the deficiency. It is not on the collateral. Collateral's not to cover it. It's on ... The suit and the contract is on the promissory note. And the promissory note says, no matter what happens about the collateral, we can do whatever we want with the collateral. Your Honor, if I ... No, the promissory note says that, but that is not the end of the discussion. Okay. Help me with that because ... Yes, happy to. All right. But the suit against your client to which they got this judgment was on the promissory note, right? It was on the loan documents, including the promissory note. And the loan documents include not only ... And in fact, the promissory note and all the other loan documents are governed by the loan document. The loan document was amended by the Mariposa Amendment to Loan Document. The Mariposa Amendment to ... I'm sorry, Your Honor. I'm just trying to address Judge Hall. Yeah, but go ahead and answer. The Mariposa Amendment to Loan Document, loan agreement, specifically delineates how the eight-acre out parcel proceeds are to be used. And by doing so, that provision is a more specific provision and usurps the generalized term that the bank can just release collateral. But more importantly, and most importantly, Your Honor, even if the bank could release collateral, that does not address the issue of the bank's continued requirement to use the proceeds from the sale of the eight-acre out parcel to pay the Miami-Dade, the Mariposa loan. That obligation still existed, never evaporated. You've answered my question. Go to Judge Clay. Thank you. Can I point you to your response to the motion for summary judgment, your opposition? Yes, Your Honor. In the record at 780 at page 12, this is talking about the consequences of the sale of the Mariposa with the release of the security. It reads, when Regents sold the Mariposa, I think this is what Judge Hall's really getting at, which is the question of whether or not the sale of the St. Lucie loan with the abrogation of any lien against Miami-Dade, whether that didn't really vitiate the spreader agreement and vitiate the 2008 agreement. You wrote, in response to the summary judgment, when Regents sold the Mariposa loan, it not only released Miami-Dade property as collateral for the Mariposa loan, Regents also unilaterally repudiated Regents and Mariposa's agreement directing the Miami-Dade's out parcel proceeds first to go to Mariposa. Correct. Now, I read that to be saying that if Regents could unilaterally repudiate the collateral as they did, it really vitiated the spreader agreement. It snipped the umbilical cord between the St. Lucie loan and the Miami-Dade property. Without Mariposa's agreement, Your Honor, which was required. But the effect of getting rid of the collateral produced that result. Yes, but there are two points, actually. That was partially what... What was the effect of this statement you made that the... So is the question for us whether or not Regents could unilaterally repudiate, whether the effect of the sale... Yes, Your Honor. And we believe, of course, Regents cannot unilaterally do so. Why not? And what it... Why not? Because the agreement states that any further amendment of any of the loan documents needs to be agreed to by the two parties. And here's the key. No, but all those agreements presuppose a link between the two properties via the spreader agreement. And that link was broken not with our agreement. The link was broken, and not only by the release of the collateral. The link was broken by virtue of the agreement regarding cross-collateralization and between the seller of the loan, Regents Bank, and the buyer of the loan, not with Mariposa as a signatory. And in that document, it specifically states the buyer releases any claim or buyer, meaning the buyer of the note. Which agreement is this? This is the agreement regarding cross-collateralization, and the only parties to that agreement... That's the spreader agreement? No. It involves the agreement between Regents Bank in selling the loan to the buyer of the loan, not Mariposa, not either borrower. We were not parties to that agreement, nor we even had knowledge of that agreement. And in that agreement, where we're not a party, the buyer of the note, the buyer of the loans, is agreeing to release any claim, not only the lien, but any claim it may have against the Miami-Dade property, the eight-acre out parcel. And when Regents had the buyer agree to do that, Regents has amended the loan documents, the Mariposa amendment to loan document, and vitiates paragraph 3E in which Regents and its borrowers agreed that that same money was going to be used to pay the Mariposa loan. And so that is a unilateral... Your Honor, respectfully, they did not. They had it... That's what the release... If I... I agreed, but let me just explain why I don't think so. They may have had the right to release the collateral, although we even dispute that because we think the Mariposa amendment to loan agreement takes away that right. However, even if it doesn't, what the bank did not have the right to do was change paragraph 3E unilaterally of the Mariposa amendment to loan agreement, which said where the proceeds have to go... The Mariposa amendment to loan agreement was June 26, 2000. It's confusing to me because the contracts keep changing the name of the agreements. It used to be the loan agreement. I know. New agreement, now it's this agreement, right? Total nightmare, Your Honor, but we... You've memorized all this stuff, but it's hard for us to keep it in our head. Agreed, and I'm happy to help you, Your Honors, through that, and I think our briefing does that, hopefully, at some level, but happy to help you do that. I see I'm past my time, but if I may answer your question, the key to this, the key to this whole case, and the mistake that the district court made, the error that the district court made, is that it never gave Mariposa the ability to go to trial to figure out, to let the court figure out where the proceeds from the 8-acre out parcel were required to go. We contend that the 8-acre out parcel proceeds were absolutely... Let me just stop you right there. The proceeds from the 8-acre parcel, the proceeds from the 8-acre parcel don't exist. There were proceeds from the sale of the entire Miami-Dade property. Which includes the 8-acre out parcel. I know, but how many, you keep talking about a subdivision of it, which may be $1, $2, $10. Well, no, actually, Your Honor, the record is clear, and the only evidence in the record is that the proceeds from the, that are attributable to that 8-acre out parcel was enough money to pay all categories under the Mariposa Amendment to Loan Agreement. That's the only evidence in the record. So, and the judge accepted that, effectively, in her summary judgment order. And that would pay all of Mariposa if you're considering the Miami, the St. Lucie loan, the one you paid on first. Correct. It would have paid all of it. And the only reason the money didn't go there is because Regents chose to breach that agreement by agreeing with the buyer only that it would, that the money would not end up going to pay Mariposa loan because Regents sold that loan. But when Regents sold that loan, it made a mistake. It breached the agreement it had with its own borrower. And there are consequences to that breach. And that's what the district court, that's one of the errors that the district court made. Now, who is its own borrower at that point? Mariposa. Mariposa. But also Miami-Dade. Mariposa agreed that you could throw the collateral away. It only agreed, at best, it only agreed that you could release the collateral. It never agreed that you can change the way in which we all agreed, the bank, etc., we're going to use the proceeds from the sale of the eight-acre out parcel. Once you release the collateral, doesn't it just go away? No. No. And here's why. Regents Bank still had the Miami-Dade loan and still had a first mortgage on the Miami-Dade property collateral. So when that Miami-Dade property collateral, including the eight-acre out parcel, was sold, Regents controlled that money. And they amended, in your view, the recorded first lien and turned it into a second lien? No. Not, Your Honor. Because you're saying the proceeds from Miami-Dade have to go to St. Lucie. Well, the lien issue is not the same. There is a lien, but it's not dispositive. That's the effect of what you're saying. Not really, Your Honor, if I may. There was a valid first lien, Miami-Dade, that goes up against the Miami-Dade loan, correct? Yes, except it's only a lien. Recognize that, absent your view of the 2008 agreements, that Miami-Dade loan would be paid off by Miami-Dade proceeds. That is the standard mechanism. The first lien gets paid first, unless the parties agree otherwise. And in this case, it is very clear. The parties agreed otherwise. Can you amend the recorded first lien in Florida without following a recorded amendment? The parties can agree to use the proceeds in any document they wish, and that does not have to be a public record. The lien is only a public record document that tells the world that somebody else has a lien on it. So it's a totally separate issue, which is why our view of the release of lien is that it's a bit of a red herring. It doesn't really matter because Regents agreed how that money from the sale proceeds was going to be used, along with us, to fix the two loans. And to not allow that to occur is a breach of the Mariposa Amendment to Loan Agreement because Regents controlled those proceeds from this closing of the sale of that property. And that's one of several errors, as well as the ambiguity that I mentioned earlier. I apologize, Your Honor. No, you're answering the questions. It's fine. Thank you. And I just didn't want to go too far past the time. And you've reserved your full rebuttal time. Thank you, Mr. Wright. Thank you, Your Honor. Good morning, Mr. Zasso. Good morning. Mike Zasso here on behalf of Regents Bank. Here, the District Court correctly interpreted the plain meaning of the key provisions of the loan documents to foreclose any possibility of a breach of contract. There are three reasons that support that conclusion. The first and the second are related. I'm going to address them separately. The first being Regents Bank, at all times, maintained the right to seek repayment exclusively from Mariposa. Mariposa was the borrower. And the bank, at all times, has a right to ask for the money back from the borrower alone, not to resort to collateral sources. Second, Regents Bank clearly maintained, as the Court has recognized today already, the right to release collateral, to subordinate collateral, to exchange collateral, and to dispose of it or ignore it altogether, which ties into the first point I just made, which is, of course, that Regents Bank has a right to look just to the borrower for repayment if it deems it to be in its best interest. The third point is that— That is, they don't have to foreclose on the collateral, but the problem is you can't get a deficiency judgment when you have foreclosed unless you—you have a deficiency judgment. You don't just have a judgment on the promissory note, right? Let me answer the question this way. To get a deficiency judgment on a second mortgage or a second position loan on another piece of property, there would have had to have been a foreclosure on that. That did not happen in this case, as we've already— Because it was already released. Because it was already released. Okay, so the judgment is really not a per se deficiency judgment like I'm thinking, like this was foreclosed upon in the—I see what you're saying. That's correct, Your Honor. There was actually no deficiency judgment entered in this case. It's just a judgment on the loan. How did it get to 6-3 from—it was 2-8, 2.8, and then you got a million-3. Is it just all interest and principal and attorney's fees and all that kind of stuff? In short, yes, Your Honor. Okay. To walk you through the history of it, there— I don't want—it's just—it's nothing in the 6.8, but interest, attorney's fees, and all that kind of stuff. I believe a late charge. Basically add-ons to that loan. I got it. Go ahead. To go to my third point, though, the reason that the first and second provisions that I just—or arguments that I just outlined are dispositive is because there was no amendment to them. When we look at the amendment to loan agreement that was executed in 2008, which did, in fact, contemplate a cross-collateralization of two different loans. That did exist at the time that document was executed. It doesn't actually or implicitly or explicitly modify or take away from Regions Bank the right to exercise its first two powers that I've outlined, which was, of course, to release When you look at the text of that amendment that the plaintiff has made a lot— Okay. But they say, okay, even if you can look exclusively to the borrower and just sue on the promissory note, not do anything about the collateral, you've breached their contract, keep the collateral there for this loan because of this other agreement, and they could have then—so, you know, used that collateral to reduce their debt. But they still say it's a breach of contract because you had this other thing about the collateral. I believe that's an accurate recitation of their argument, but as Judge Cook observed, and as we also contend here before this court, that's an erroneous interpretation of the contract, certainly because Regions Bank is still actually exercising its options under the promissory note, which originated under that loan to either release collateral or to pick and choose what types of collateral it would like to pursue. Now, of course, here it couldn't have pursued that collateral because it made a decision to exercise one of its rights under the promissory note to release it. And that was part of the contract to sell— Okay. Let's go to the two amendments and how you say there's no ambiguity in the two amendments. That's the heart of his argument, is that we've got these two amendments, and if you go look at them, it shows the intent of the parties going forward. It supersedes the promissory note. Forget about whether it does or does not. How do you say there's not an ambiguity in the amendments that should go to trial as to the intent of the parties to these contractual agreements here? Two points on that, Your Honor. The first would be that even if there was an ambiguity, I believe that Judge Cook and we are contending that you would not have a different result. But to get—and I'll come back to that. Maybe we'll put a little marker there to address your question directly. I want to just focus on whether there is or is not ambiguity. I understand that other routes to maybe resolve, we don't have to rely on the ambiguity. How do you read the documents to allow you to release the collateral? Firstly, because there's no conflict. I think Judge Cook correctly said that there is an option or a supplement, if you will, provided to the original promissory note through the amendment to loan agreement that was executed in 2008. In other words, it provides some further detail about how payments could be made under the promissory note. They're just all options? They're all options, Your Honor. They're correctly characterized as options. They're not modifications to the other provisions. The other reason is more fundamental in terms of the construction of the document itself. When we start with the meaning of premises, doesn't it? Your Honor, it does begin with the meaning of premises. The court is correct. When we look at the definition of premises, and we walk through this in further detail in our brief, I believe on page 28, premises is defined as what I'm going to call the trailer park. It was a property located in St. Lucie County. That trailer park is not the same property as we have down in Miami Beach, or at Miami Dade, actually. They're very different. And you don't have to necessarily look just down that line that we draw in our answer to find the definition of premises. You can actually look right down to this very same provision to subpart Roman numeral 4. If you look and see, in the event of the sale of a portion of the premises, this is in St. Lucie, the $2.8 million loan, definition of premises, and you want that to mean the St. Lucie property, right? Yes, Your Honor. And it says, then, per in, consisting of an 8-acre out parcel, right? Yes, Your Honor. The only 8-acre out parcel that we know about is the Emerald Point property. There was not an 8-acre out parcel on the Mariposa, well, not the St. Lucie property, did not contain such an out parcel, correct? So you say, and I'm reading this just as a simple-minded person, and I say, so the premises consist of an 8-acre out parcel. And I know that's not the St. Lucie property. Correct. And I read down below that I say here there is the premises, and then there's the Emerald Point property. So the premises is distinguished from the Emerald Point property, because in paragraph down at the end, 4, there's a distinction between premises and Emerald Park, right? Correct, Your Honor. They're two different pieces of property as defined within that provision. So the argument that the ambiguity is that you don't know what premises means because there's a per in here that says an 8-acre out parcel that refers to Emerald Point. Without going back to the issues we'd have with the significance of an ambiguity, if we did have an ambiguity, I will say that you'd have to find that a parenthetical that followed a defined term could somehow have the profound effect of overriding the definition, the explicit definition afforded to that term by the parties, and then somehow reconcile the conflict that such a redefining. It also has an argument that in connection with all these amendments earlier that the definition of premises got changed. Which is not true. We would dispute that, and I think that we lay out the correct interpretation, which is that premises goes back to the original promissory note. It was a term that its origin came from there. And they have an argument in their brief that they changed that in connection with amending the agreement sometime between the original agreement and the 2008 agreement. Which is a point that we both, we disagree about that conclusion. And I think that to come back to our reading of. Bottom end of your argument is you take the two 2008 agreements, which were trying to memorialize what the parties wanted to do with the proceeds of the sale of either one of the two properties. There are two agreements. One for Miami-Dade, one for St. Lucie, right? Correct. Your argument is that there is a Scrivener's error that consisting of an eight-acre out parcel in the St. Lucie agreement should not have been there. That's correct. That provision was. If I erase that, then everything is consistent in your mind. That's exactly correct, Your Honor. And that it all makes sense because of what the parties were saying. In the event of a sale in either party, the proceeds of the sale go first to the payment of the loan in question of that property. And then there's some other things where you could be sharing between the two. That's correct. Then the options begin to make more sense that are laid out for the application. There's some deposition testimony from the other side that's exactly to the contrary. That says, oh, no, no. That may be what looks like a reasonable thing for people to do. But this was a very complicated situation because there were guarantors and, you know, the left hand knew who the right hand was, and it was a gamish. Basically, the really valuable property here, the one that was going up in value was Miami-Dade. The one that was going in the sinkhole was St. Lucie. And then from the perspective of your adversary, they wanted to make certain that they didn't, the guarantors there didn't get totally whacked, as you say, because you can go against the maker of the note when you want to. They wanted to make certain that some of the Jews out of Miami-Dade got benefited to St. Lucie. Isn't there a deposition testimony to that effect? I think that's, respectfully, I don't believe Judge Cook looked at that evidence. No, they didn't look at that. Because of the parole evidence rule. And because she concluded that because of the other compelling arguments that she outlines very detailedly. What I was trying to get in the background was, I used to work in a bank, and it seemed to me like ordinarily the very sensible thing to do would be your view of the case. You've got cross-collateralization, you're going to, just to make certain that they're laying aside the part that you threw away the Miami-Dade security with regard to the other loan, at least for the benefit of the borrower, the new owner of the loan. But on the other hand, if there is evidence in the record that the parties decided to do something that's a little out of the ordinary, shouldn't that be put in the mix? I don't think there is such evidence here. And the reason being is we'd have to go back to the fundamental point that Regions Bank decided to sever this collateral from the loan and sell that loan off to the then-noteholder, which was Florida Loan Holding Partners. That new subsequent purchaser pursued its remedies through its own action, whereas Regions Bank then went against the property in a foreclosure action in Miami-Dade and foreclosed pursuant to those loan documents, that promissory note. And so that's certainly not the circumstance before the court today. But— Your question about the distribution of proceeds, which is the little Roman 1, 2, 3, 4, in both the 2008 agreements, both sides. If your adversary is right and premises in the Miami-Dade loan meant St. Lucie property, then is it so that there weren't enough proceeds from the $7 million Miami-Dade sale to cover both the St. Lucie loan and the collateral things under 2, 3, and 4? There was not—hopefully I'm understanding your question. I'm going to answer it. If I don't, correct me. But there was not enough money for the Miami-Dade property to satisfy both the loan that it had a first-position mortgage on and the other items that are listed out 1 through 4. Which are on Miami-Dade. Correct. There was not enough— I don't think there's any doubt that there wasn't enough money from the Miami-Dade sale to pay off Miami-Dade, pay off all the— Which was a short sale. Correct. A short sale. Wasn't enough to pay off—clearly couldn't have been because it was a short sale. Correct. So I read your adversary, which I'm not certain I buy their argument. They're saying this strange set of documents. But when you sold Miami-Dade, you had to take the proceeds from Miami-Dade, and the first thing you had to do was to pay down the St. Lucie loan, a couple of million bucks. Right? That is the argument they're making. And then they said there were a few other little clouds about taxes and stuff. I don't know exactly what it was. So presumably those numbers could be added up, so somebody could tell me exactly how much money that was. So the question is, did the short sale proceeds pay enough money to pay off St. Lucie plus the other obligations in 2, 3, and 4? I think as you brought up when my colleagues were discussing the case with you, the total fund from the premises, probably. We think probably. The amount of proceeds that would be attributable to the portion that is the 8-acre out parcel, that fact is not in the record. Because the sale itself, as the court knows, was a short sale. So we sold the entire property, not pieces of it. And it wasn't even enough to satisfy the full debt under that promissory note that was held by Regions Bank at the time. There's confusion in my mind about when you talk proceeds, once you have done a short sale of the entirety of the Miami property, is all of that money supposedly being exercised in Clause 1 to pay down one debt or the other? Or is it just paying down a piece of Miami-Dade? It was allocated at the time of the sale to satisfy the full debt owed under the Miami-Dade promissory note. And if I can bring up another important point that I want to make. There was no judgment on the Miami-Dade note? No judgment was ever entered, Your Honor, on the Miami-Dade note. It's only on the St. Lucie note. And all that property went to pay off the $10 million. I forgot. How much was Miami-Dade? Miami-Dade, I believe, was $10,800,000 in principal. And then, of course, because both loans went into default before any of these sales, these short sales, ever took place, we have an enhanced amount that's ultimately going to be owed under both debts. But anyway, the Miami-Dade went to the Miami-Dade loan distinguished loan. Yes, Your Honor. The Miami-Dade property was sold. I just thought about something looking at this because I'm focusing on these two amendments. It says, in the event of the sale of a portion of the premises, borrower shall pay lender the net proceeds. This is all to restrict what the borrower has to do. That's correct, Your Honor. Not what the lender has to do about anything. That's correct, Your Honor. And there was never a sale of a portion of the premises by the borrower. Did the borrower ever sale it? They were in default. And did y'all foreclose it? Did the borrower agree with it so that you just extinguished the Miami-Dade debt? There was a foreclosure, but ultimately, the full debt through the short sale was a complete release of that debt. And you bring me to that point, and I want to make it one step further, if the court will permit, and I see that my time is expiring, but the term borrower in the 2008 Mariposa Amendment to Loan Agreement refers to Mariposa. It doesn't refer to the party that owned the Miami-Dade property. So it would be a very unusual construction if you think about it. A party that doesn't own property is somehow going to obtain proceeds from a sale of another company's property, take those proceeds away from that company, and then use them to satisfy its own debts. That's a construction that is simply unreasonable, and it would be rightly rejected by any court, even if there were an ambiguity. Certainly, the Mariposa debtor may have wanted to use its own proceeds from the sale of its own property to satisfy all of these four items. But it's a real stretch to say that they could have taken the proceeds from the sale of another person's property away from that person, and then paid them to Regents Bank. That never happened. This is a fact that's not disputed as well. Mariposa never came to Regents Bank with that pile of money, and said, or excuse me, never came to Florida Loan Holding Partners, the subsequent purchaser, with that pile of money, and said, here's all of the money, the $2.8 million we're paying to you, use this to satisfy your debt. That never happened, and we ask the court respectfully to affirm the district court's judgment on this matter. Thank you, counsel. Yeah, sure. Following up on Judge Hull's question about what borrower meant, what kind of sale the property was contemplated in these 2008 agreements? Was it a foreclosure sale by the bank? Was the borrower, was the borrower who, the owner of each of these two properties, who gave a lien thereon to the bank, were they free to sell the property if they wanted to? They were, the state of the market at the time was that- I'm just asking whether it's a matter of law, whether if they wanted to, they could go out and sell the property. I believe it's a matter of law. The owner of the property can enter into a contract of sale, whether or not there's going to be an adverse consequence. What I'm asking about these two agreements really contemplated a situation in which the borrower was selling the property would make sense, then if the borrower, in the event of a sale, the borrower will get the money, will then pay the lender. So the sale transaction is, owner of property sells it, they get money, they pay it down. If that was the contemplation of what this was, then this hadn't happened, because the sale of the property here wasn't sold by the borrower. That's correct, Your Honor. We agree with that interpretation. That just makes the whole case go away. If this clause doesn't apply, I don't know what this clause was intended to cover. Any kind of a sale of the property? I think that would go back to our original argument we wanted to make to the Court about the significance of this particular provision, which is that it never came into effect. It never came into effect because we released the property, because there were rights to just proceed against exclusively the borrower, and not to look to third-party sources, which would make a very onerous process of creating satisfaction of the debt for the bank. And certainly because there was never a sale of the property at the time that the loans went into default. And the other provisions, I know Judge Cook did a very thorough job of explaining. I don't want to take up too much time in going through them again with the Court. If there are no further questions... There are not. Your Honor, we ask that the Court affirm. Thank you. Thank you very much. Your Honors, I have three minutes, so I have to make this work. The colloquy that Your Honors had with opposing counsel exemplifies the need for a trial here, and exemplifies this unusual circumstance that requires a trial to figure out what the party's intent was. There is no dispute that there's an ambiguity between the two amendments. Regents Bank admits that. There's no dispute that there's some question as to what premises means Judge Clevenger. There's no dispute that there is some question as to what and or means. Does it mean you have to pay all of it? Does it mean you get the choice to pay any of it the bank wishes? All of these issues needed to be addressed at a trial. Why? The purpose of this very unusual transaction was to solve the Regents Bank's problems with these loans, as well as the borrower's problems with these loans. You had an underperforming, under-collateralized loan in Mariposa, and you had a way over-collateralized loan in the Miami-Dade property, but had no revenue. The Miami-Dade property had no revenue. So the idea was... And by the way, the document says any sale. There's no definition of what type of sale. So we don't know the answer to that without a trial on the matter, although sale means to me the most broad term. However, in order to fix these two loans, because Regents wanted performing loans, all the parties got together, and the beauty here was that the Mariposa loan and the Miami-Dade loan were controlled by the same people. So there could be a three-way transaction that solved both problems. The three-way transaction was documented in the amendments to both loans. When that occurred, the idea was that when that eight-acre out parcel sold from the way over-collateralized loan, we can take that money and fix the problems. We can take that money by applying it to the Mariposa loan by paying it down, which was way under-collateralized, and get rid of that. We can also use it to fund interest reserves for the Miami-Dade loan that had no revenue, and we can pay real estate taxes on both loans. Problems fixed, and there was a potential sale of the eight-acre out parcel at the time, which prompted all of this, and the record is clear on that. And that was done. Signed by everyone. The release is a side point and irrelevant because it still didn't address what happens to the proceeds from the sale, which the amendments did. So then what happens is Regents defaults or breaches that because three months later it decided, you know what, we need cash, so I'm going to sell the Mariposa loan and get a million three in cash. But the only way to do that and to prevent the effect of the Mariposa Amendment to Loan Agreement, which would have taken its left, it's the collateral that it had left, and applied to the Mariposa loan, is it had to cut it off and agree that the Mariposa buyer, the buyer of Mariposa loan could not use the Miami-Dade proceeds to pay down that loan because Regents was no longer the lender there. That needs to be tried. That was the error. This set of facts is what needs to be tried. And our explanation of what these documents mean fixes the loan. Regents explanations of what these documents mean do not fix the loan, which is completely contrary to the record. That's why we need a trial. I apologize for my 19 seconds over there. Thank you very much. Thank you both. This court will be in recess until 9 a.m. tomorrow morning.